## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

PHILLIP LAY,                              Case No. 1:12-cv-361
      Plaintiff,                         Dlott, J.
                                          Litkovitz, M.J.

    vs.

COMMISSIONER OF                           **REPORT AND**
SOCIAL SECURITY,                          **RECOMMENDATION**
      Defendant.

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 11), the Commissioner's memorandum in opposition (Doc. 16), and plaintiff's

reply memorandum (Doc. 19).

### I. Procedural Background

Plaintiff filed an application for DIB in December 2007, alleging disability since March

1, 2006, due to bilateral knee replacement, diverticulitis, tremors in both hands, high blood

pressure, high cholesterol, and asthma. (Tr. 144). Plaintiff filed a Disability Report dated April

17, 2008, adding new conditions of tendonitis/bursitis of the right shoulder and bulging discs at

C6-C7 with an onset date of February 2008 for each. (Tr. 167). Plaintiff's application was

denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted

a de novo hearing before Administrative Law Judge (ALJ) Deborah Smith. Plaintiff and a

vocational expert (VE) appeared and testified at the ALJ hearing. On June 7, 2010, the ALJ

issued a decision denying plaintiff's DIB application. Plaintiff's request for review by the

Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Commissioner of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff met] the insured status requirements of the Social Security Act through December 31, 2011.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since March 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: a history of bilateral knee replacement and obesity (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a) except he must be allowed to alternate every 30 minutes between sitting and standing. He can use foot controls only occasionally. He should avoid working around hazards such as heights and dangerous machinery.
>
> 6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]
>
> 7. The [plaintiff] was born [in 1962] and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The [plaintiff] subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

---

[1] Plaintiff's past relevant work was as a carpenter's helper/construction worker. (Tr. 16).

8.  The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[2]

11.  The [plaintiff] has not been under a disability, as defined in the Social Security Act, from March 1, 2006, through the date of [the ALJ's] decision (20 CFR 404.1520(g)).

(Tr. 11-17).

### C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a

---

[2] The ALJ relied on the testimony of the VE to find that plaintiff could perform sedentary unskilled jobs such as bench assembler (1,800 jobs in the local economy and 900,000 jobs in the national economy) and interviewer (3,000 jobs in the local economy and 224,000 jobs in the national economy). (Tr. 17).  The ALJ further determined that if plaintiff were limited to occasional handling and manipulation, a limitation which the ALJ found was not supported by the record, then plaintiff could still perform the unskilled sedentary job of surveillance system monitor (410 jobs in the local economy and 81,000 jobs in the national economy).  (*Id.*).

preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

The pertinent medical findings and opinions have been adequately summarized in plaintiff's Statement of Errors and will not be repeated here. (Doc. 11 at 2-7). Where applicable, the Court will identify the medical evidence relevant to its decision.

On appeal, plaintiff argues that: (1) the ALJ erred by failing to properly identify plaintiff's "severe" and "non-severe" impairments and by failing to account for all of the limitations imposed by both the severe and non-severe impairments in the RFC finding; (2) the ALJ improperly weighed the opinions of plaintiff's treating orthopedic surgeon, Dr. John Gallagher; and (3) the ALJ improperly evaluated plaintiff's credibility.

**1. The ALJ's RFC finding, which accounted for limitations resulting from plaintiff's "severe" and "non-severe" impairments, is supported by substantial evidence.**

A severe impairment or combination of impairments is one that significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1521. Basic work

activities relate to the abilities necessary to perform most jobs, such as the ability to perform physical functions. 20 C.F.R. § 404.1521(b). In the physical context, a severe impairment or combination of impairments means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. *See* 20 C.F.R. § 404.1521(b)(1). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element that plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). An impairment will be considered non-severe only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). The severity requirement is a "*de minimis* hurdle" in the sequential evaluation process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *See also Rogers v. Commissioner*, 486 F.3d 234, 243 n.2 (6th Cir. 2007).

Here, the ALJ found "severe" impairments of (1) a history of bilateral knee replacement, and (2) obesity. (Tr. 11). Plaintiff alleges the ALJ nonetheless failed to properly account for the limitations caused by his knee impairment. Plaintiff asserts that the bilateral knee replacement was not entirely successful and that his treating orthopedic surgeon, Dr. John Gallagher, recommended a number of accommodations for his knee impairment, including the need to alternate sitting and standing approximately every 30 minutes, the need to take unscheduled breaks, a restriction against crouching or squatting, and a limitation on standing/walking no more than two hours per 8-hour workday and sitting no more than two hours per 8-hour workday. (Doc. 11 at 14). As this particular argument goes to the weight

6

accorded the treating physician's opinion, which plaintiff raises as his second assignment of error, the Court will address the ALJ's alleged failure to account for the restrictions imposed by Dr. Gallagher to accommodate plaintiff's knee impairment in connection with that assignment of error.

Plaintiff also alleges the ALJ failed to recognize he suffers from additional "severe" impairments of bilateral hand tremors, diverticulitis, cervical spine degenerative disc disease, and right shoulder arthritis, and to incorporate the limitations imposed by these impairments into the RFC finding. (Doc. 11 at 11).

The ALJ acknowledged that imaging evidence showed cervical degenerative disc disease (Tr. 13), but plaintiff points to no evidence showing any physical restrictions resulting from this impairment. An MRI of plaintiff's cervical spine performed in January 2008 disclosed only minimal changes. (Tr. 500). The findings included minimal hypertrophic changes at mid-cervical levels; no cervical cord signal abnormalities; minimal facet arthropathy with no compressive abnormality at the C2-3 level; a very small broad based noncompressive central disc protrusion with patent neural foramina at C3-4; a small broad based disc protrusion causing mild central stenosis with no cord compression or high grade foraminal stenosis at C4-5; a small broad based left central disc protrusion with partial annular tear causing borderline to mild central stenosis and borderline narrowing of the left C6 foramen at C6-7, but no significant abnormality of the disc or neural foramina at that level; and similar findings at C7-T1. (*Id.*). The impression was "mild noncompressive multilevel cervical degenerative disc disease." (*Id.*). There is no evidence in the record that plaintiff obtained any type of treatment for his mild cervical degenerative disc disease or that any physician imposed functional limitations to account for this condition. Plaintiff points to no evidence mentioning this condition subsequent

7

to the MRI.  Moreover, consultative examining physician Dr. Bailey noted plaintiff's complaint of chronic neck pain exacerbated by overhead reaching with his right arm and chronic upper back pain in her February 2008 report, but range of motion of the cervical spine was within normal limits, and the overall results of her examination were "normal" in this regard.[3]  (Tr. 469-70).  Plaintiff's treating orthopedist, Dr. Gallagher, made no mention of cervical symptoms in the February 6, 2009 physical RFC questionnaire he subsequently completed, and he imposed no limitations in connection with any such symptoms.  (Tr. 523-27).  Accordingly, the ALJ did not err by failing to find that plaintiff's cervical degenerative disc disease was a severe impairment and by failing to impose restrictions to account for the condition.  *See Farris*, 773 F.2d at 90.

Nor is there evidence that shows plaintiff's right shoulder impairment, which the ALJ thoroughly discussed in her decision (Tr. 13), was more than a slight abnormality that could be expected to interfere with plaintiff's ability to work.  Plaintiff first complained of right shoulder pain to his family physician, Dr. Prasad Chandra, in January 2008, stating that the pain went from his right shoulder to his elbow, and that he felt weak when lifting a gallon of milk.  (Tr. 487).  Dr. Chandra referred plaintiff to Dr. Gallagher for right shoulder pain later that month. (Tr. 486).  Plaintiff saw Dr. Gallagher on March 5, 2008, at which time he reported right shoulder pain of two months duration that was aggravated by overhead activities or reaching behind his back.  (Tr. 495).  Dr. Gallagher  obtained x-rays, diagnosed right shoulder rotator cuff tendonitis, administered an injection for pain relief, and referred plaintiff to physical therapy.  (*Id.*).  Plaintiff began participating in physical therapy for his right shoulder on March

---

[3] Dr. Bailey concluded that plaintiff "appears capable of performing at least a mild to moderate amount of sitting, ambulating, standing, bending, pushing, pulling, lifting and carrying heavy objects.  He would probably complain of pain with prolonged kneeling.  In addition, [he] has no difficulty reaching, grasping and handling objects."  (Tr. 470-71).

11, 2008. (Tr. 506-520). Plaintiff reported to Dr. Gallagher on April 16, 2008, that he had improved 80% with the injection and physical therapy but he still had significant symptoms when attempting to lift an object with his right shoulder fully abducted to the side. (Tr. 499). Dr. Gallagher noted on examination that plaintiff had improved range of motion, particularly internal rotation, but that he had positive impingement testing and pain with supraspinatus function. (*Id.*). Dr. Gallagher's impression was improvement with the injection and physical therapy. Since plaintiff was improved, the plan was to continue plaintiff in physical therapy for the next few weeks and, if the improvement decreased or if his pain persisted, plaintiff was to call back for an MRI scan. (*Id.*). Plaintiff was discharged from physical therapy on May 2, 2008, after 15 sessions due to meeting his goals.[4] (Tr. 520). There is no evidence plaintiff sought treatment thereafter for his shoulder or that he ever requested an MRI scan. Dr. Gallagher made no mention of shoulder symptoms in the February 6, 2009 physical RFC questionnaire he subsequently completed, and he imposed no limitations in connection with any such symptoms. (Tr. 523-27). Nor is there any mention of shoulder pain in the office notes of plaintiff's treating physician, Dr. Chandra. (Tr. 533-34- 12/09; Tr. 542-44- 2/09). Further, no physician of record imposed any functional limitations in connection with plaintiff's right shoulder condition. Plaintiff complained to Dr. Bailey on examination in February 2008 that raising his arm overhead exacerbated his neck pain, which he described as a "dull ache." (Tr. 468). However, the results of Dr. Bailey's examination showed range of motion studies to be within normal limits, and she made no positive findings related to plaintiff's right shoulder. (Tr. 469-70). Accordingly, the ALJ's decision that plaintiff's right shoulder pain is "non-severe"

---

[4] Although a box is checked noting this as the reason for the discharge, the form also indicates that plaintiff's goals were only "partially" met and that he would continue to improve with "HEP" (home exercise program). (Tr. 520).

9

finds substantial support in the record.

Further, the ALJ did not err by finding plaintiff's diverticulitis to be a "non-severe" impairment and by not including any functional limitations to account for this impairment in the RFC finding. (Doc. 11 at 13-14). The ALJ acknowledged that plaintiff suffers from diverticulitis and that he underwent surgery for the condition in 2004. (Tr. 13, 214). Plaintiff was subsequently hospitalized in August 2005 for abdominal pain "of undetermined etiology suggestive of diverticulitis." (Tr. 223-264). A CT scan in June 2007 confirmed that plaintiff suffered from "[m]ild uncomplicated descending colon diverticulitis." (Tr. 387). However, there is no indication in the record that plaintiff's diverticulitis causes debilitating symptoms, and no medical provider imposed any functional limitations resulting from the condition. Plaintiff relies solely on his testimony at the ALJ hearing and representations in the Statement of Errors to argue the ALJ should have accommodated flare-ups of his diverticulitis, which he alleges cause pain and require him to use the restroom on a frequent and urgent basis, by including limitations of ready access to restroom facilities and absences averaging one day per month due to abdominal pain and gastrointestinal distress. (Doc. 11 at 14, citing Tr. 38). However, plaintiff's testimony is insufficient to show his diverticulitis imposes these or any other functional limitations. Plaintiff testified that his diverticulitis flares up only "occasionally" and that he had not experienced a flare-up in approximately one year as of the date of the ALJ hearing. (Tr. 38). The Statement of Errors includes a citation to one treatment record of Dr. Chandra dated October 2007 to show plaintiff has flare-ups of his diverticulites which are treated with antibiotics, but these notes are not clear as to whether Dr. Chandra actually diagnosed and treated plaintiff for a diverticulitis flare-up. (Doc. 11 at 12-13, citing Tr. 487). There are no other treatment records pertaining to plaintiff's diverticulitis. Plaintiff's

10

diagnosis of diverticulitis, without any related evidence showing recurring or severe symptoms or functional limitations, does not denote significant limitations on the ability to perform basic work activities. *See Farris*, 773 F.2d at 90.

Finally, plaintiff contends the ALJ erred by failing to find that his hand tremors, which he asserts progressed over time from a minor annoyance into a constant problem, are a severe impairment. (Doc. 11 at 11-12). The ALJ acknowledged plaintiff's allegation that he suffered from hand tremors his entire life. (Tr. 13). However, the ALJ found the tremors were not a severe impairment, stating that plaintiff had been able to work as a carpenter and construction worker despite the tremors. (*Id.*).

Substantial evidence supports the ALJ's decision in this regard. In her consultative examination report dated February 2008, Dr. Bailey described only a "[m]ild bilateral hand tremor." (Tr. 470). Dr. Bailey also observed that plaintiff had some mild difficulty writing legibly.[5] (Tr. 473). However, Dr. Bailey found that plaintiff had normal grasp, manipulation, pinch and fine coordination, and she found he had no difficulty reaching, grasping and handling objects. (Tr. 471-72). Plaintiff nonetheless relies on his subjective reports of his symptoms to his treating physician, Dr. Chandra, to show that his hand tremors worsened over time to the point where they became a severe impairment. (Doc. 11 at 11-12). Dr. Chandra stated in February 2009 that plaintiff reported his "hands shake all the time" and that the shaking increased with stress and when he held a fork or spoon. (Tr. 542). On physical examination, Dr. Chandra reported "tremors+both hands right more than left. No rigidity." (Tr. 543). Dr. Chandra listed a diagnosis of "essential and other specified forms of tremor" with an onset date

_____

[5] Plaintiff asserts that Dr. Bailey made this observation in February 2009, but Dr. Bailey actually made this observation in her report dated February 2008. (Tr. 473, 475).

11

of February 23, 3009 under "new problems." (Tr. 544). In November 2009, Dr. Chandra

reported that plaintiff had resting tremors of the hands, which he assessed as "unchanged," and

he reported there was no weakness of the extremities. (Tr. 534). In neither report did Dr.

Chandra assess the severity of plaintiff's hand tremors. This evidence does not show a

worsening in plaintiff's condition subsequent to the date of Dr. Bailey's report or indicate that

plaintiff's tremors imposed functional limitations on him. In addition, no examining or

reviewing physician imposed any limitations on plaintiff in connection with his tremors. To the

contrary, Dr. Gallagher found in his February 2009 report that plaintiff had no significant

limitations with reaching, handling or fingering. (Tr. 526). Accordingly, the ALJ's decision

regarding the absence of limitations imposed by plaintiff's hand tremors finds substantial support

in the record.[6]

　　As substantial evidence supports the ALJ's severity and RFC findings, plaintiff's first

assignment of error should be overruled.

### 2. The ALJ did not err in weighing the treating physician's opinion.

　　It is well-established that the findings and opinions of treating physicians are entitled to

substantial weight. "In general, the opinions of treating physicians are accorded greater weight

than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*,

127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.

---

[6] The ALJ found based on the testimony of the VE that even if plaintiff were limited to occasional handling and manipulation, he could still perform the sedentary unskilled job of surveillance system monitor, that there are 410 such jobs in the local economy and 81,000 such jobs in the national economy, and that this constitutes a significant number of jobs. (Tr. 17). Plaintiff contends in his reply brief that there is some authority for the proposition that 485 local jobs is not a significant number. (Doc. 19 at 3, citing *Crabtree v. Secretary of HHS*, No. 5:89cv2081, 1991 WL 65536 (N.D. Ohio Feb. 14, 1991)). However, *Crabtree* predates the Sixth Circuit's decision in *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999), which held that the Commissioner is not required to show that job opportunities exist within the local area. The Sixth Circuit has relied on *Harmon* to find 19,000 unskilled jobs is a significant number of jobs. *Dawson v. Commissioner of Social Security*, 468 F. App'x 510 (6th Cir. 2012).

1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing former 20 C.F.R. § 404.1527(d)(2)).[7] If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating

---

[7] Title 20 C.F.R. § 404.1527 was amended effective March 26, 2012. The provision governing the weight to be afforded a medical opinion that was previously found at § 404.1527(d) is now found at § 404.1527(c).

13

source's opinion.'" *Cole*, 661 F.3d at 937 (citing former 20 C.F.R. §404.1527(d)(2)). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2p).

Plaintiff contends that the ALJ erred by improperly analyzing the opinion of his treating orthopedist, Dr. Gallagher. (Doc. 11 at 14-18). Plaintiff argues that none of the ALJ's stated reasons for discounting Dr. Gallagher's February 2009 opinion are valid. Plaintiff asserts that the ALJ erroneously relied on Dr. Gallagher's earlier assessments of plaintiff's functional limitations as compared to Dr. Gallagher's February 2009 assessment and failed to consider the progressive nature of plaintiff's conditions when rejecting the latter assessment. Plaintiff also argues that the ALJ erred by discounting Dr. Gallagher's opinion as inconsistent with the record and too restrictive based on an erroneous interpretation of Dr. Gallagher's report of plaintiff's activities. (Doc. 11 at 16-17). Finally, plaintiff argues that the ALJ improperly discounted Dr. Gallagher's opinion based on her incorrect finding that Dr. Gallagher sees plaintiff only once a year and is thus "not really a treating source," (Doc 11 at 17, citing Tr. 15-16), when in fact this is the accepted frequency of visits for an orthopedic surgeon; Dr. Gallagher saw plaintiff more frequently until he "had nothing more to offer" plaintiff; and the ALJ's discounting of Dr. Gallagher's opinion on this ground is illogical given that the ALJ purportedly relied on the opinion of a reviewing physician who never saw or examined plaintiff.[8] (*Id.* at 17, citing Tr. 16).

The ALJ gave good reasons for discounting Dr. Gallagher's assessment. Contrary to plaintiff's argument, the ALJ expressly acknowledged that Dr. Gallagher is a "treating

---

[8] This is an apparent reference to Dr. Bailey, as the ALJ discussed Dr. Bailey's opinion at this portion of her decision and decided to give the opinion "some weight." (Tr. 16). However, Dr. Bailey did in fact examine plaintiff. (Tr. 468-75).

physician" but reasonably took into account the frequency of plaintiff's visits with Dr. Gallagher, which the ALJ noted were limited to approximately once a year. (Tr. 15-16). The ALJ recognized that although Dr. Gallagher was a treating physician, his opinions were entitled to "little weight" because his most recent assessment of February 2009 was "markedly inconsistent" with his earlier assessments and office notes, and Dr. Gallagher had provided no explanation showing that plaintiff's condition had deteriorated. The ALJ decided to give greater weight to Dr. Gallagher's opinions from 2006 and 2007 (Tr. 342, 344, 350), which the ALJ found differed markedly from the opinion he provided in February 2009 (Tr. 523-27). (Tr. 16).

The ALJ's reasons for discounting Dr. Gallagher's opinions find substantial support in the record. The objective findings Dr. Gallagher made following plaintiff's bilateral knee replacement were minimal, and plaintiff was not initially assessed as having severe functional limitations resulting from his knee impairment. In October 2006, six months after plaintiff's surgery, some weakness, swelling, and giving away of the left knee was noted, as well as intermittent pain which plaintiff rated as 0-5 at rest and 0-8 with activities. (Tr. 348). However, x-rays showed no loosening, and Dr. Gallagher assessed plaintiff as able to lift 100 pounds, climb a 10-foot ladder, and kneel, although knee pads were recommended. (Tr. 350). Plaintiff next saw Dr. Gallagher in April of 2007, at which time mild swelling, effusion, and tenderness of the left knee were noted, and plaintiff's condition was rated as "improving." (Tr. 342-343). The same restrictions from the prior visit were continued. (Tr. 342). Dr. Gallagher assessed no limits on activities of daily living; plaintiff's walking endurance was unlimited; and plaintiff could walk stairs unaided. (Id.). Bilateral x-rays showed the prosthesis to be in good position and there were no signs of loosening. (Tr. 344). The plan/treatment was for "HEP [home

15

exercise program], bicycling, elliptical training."[9] (*Id.*). Plaintiff was to return in one year for x-rays. (*Id.*). At the April 2008 examination, Dr. Gallagher assessed plaintiff as having a well-functioning right knee replacement and only mild persistent problems on the left. (Tr. 496-99). The left knee showed "a mild effusion, mild tenderness, improved range of motion since last office visit, but increase in varus to valgus instability and mild anterior and posterior instability." (Tr. 499). Despite these issues, Dr. Gallagher assessed plaintiff as "functioning relatively well at present" and therefore determined to do nothing differently "except continue the exercise program" and have plaintiff return in six months for a repeat x-ray of the left knee and possible aspiration and further evaluation if the effusion persisted. (*Id.*). Plaintiff returned to see Dr. Gallagher on November 19, 2008, at which time plaintiff reported no change in the condition of his left knee as compared to six months earlier. (Tr. 553). Plaintiff complained of "mild pain" at rest which he rated as 2/10; pain which was aggravated and increased to 6/10 with activities, especially going down stairs, and by sitting for prolonged periods of time of approximately 30 minutes; and intermittent catching. (*Id.*). X-rays of the knees as compared to the April 2008 x-rays showed no change and indicated the components of plaintiff's left knee were in good position with no signs of loosening or osteolysis. (Tr. 499, 553). The impression was painful left knee replacement associated with mild effusion; mild history of catching subpatellar; and no signs of loosening or osteolysis on x-ray. (Tr. 553). Dr. Gallagher aspirated the left knee and recommended physical therapy of the left knee to address left thigh atrophy, with physical therapy to start date in January for insurance purposes. (Tr. 553).

---

[9] Plaintiff argues the ALJ erred by finding Dr. Gallagher reported plaintiff was bicycling and doing elliptical training because the report states that the plan of treatment was for a home exercise program of bicycling and elliptical training. (Doc. 11 at 16, citing Tr. 16). Plaintiff alleges that a home exercise program does not entail bicycling for extended distances or riding an elliptical trainer for long periods, which is the type of activity the ALJ "seems to believe" plaintiff was performing. (Doc. 11 at 16-17). Plaintiff's theory as to what the ALJ appeared to believe is speculative and finds no support in the ALJ's decision or elsewhere in the record. (Tr. 16).

16

Despite a lack of objective medical findings to show plaintiff's condition deteriorated to a significant degree following his bilateral knee replacement, Dr. Gallagher issued an assessment in February 2009 that imposed significantly greater functional limitations than those found in his earlier reports. (Tr. 523-27). Whereas Dr. Gallagher's April 2008 report noted that plaintiff's walking endurance was unlimited and mentioned no restrictions on sitting, in February 2009 Dr. Gallagher opined that plaintiff was limited to walking 3 blocks at a time without rest or severe pain; sitting for 30 minutes at a time and less than 2 hours in an 8-hour workday; standing for 45 minutes at a time; and standing/walking less than 2 hours in an 8-hour workday. (Tr. 525). Dr. Gallagher also opined, without explanation, that plaintiff is likely to be absent from work more than four days per month as a result of his left knee impairment. (Tr. 527). Dr. Gallagher offered no explanation for the change in his assessment of plaintiff's functional limitations. In light of the absence of objective evidence showing plaintiff's left knee condition deteriorated following Dr. Gallagher's initial assessments to the point where the impairment became debilitating, the ALJ reasonably decided not to give Dr. Gallagher's February 2009 opinion controlling weight. (Tr. 16). Substantial evidence supports the ALJ's decision to give greater weight to Dr. Gallagher's earlier opinions concerning plaintiff's limitations and to the assessment of consultative examining physician Dr. Bailey that plaintiff can perform at least a mild to moderate amount of sitting, ambulating, and standing, which the ALJ found to be consistent with Dr. Bailey's objective findings and with plaintiff's ability to care for three young children during the day while his wife works. (Tr. 16, citing Tr. 470-71).

For these reasons, plaintiff's second assignment of error should be overruled.

### 3. The ALJ's credibility determination is supported by substantial evidence.

Plaintiff argues the ALJ erred in assessing his credibility. (Doc. 11 at 18-20). Plaintiff

17

asserts the ALJ improperly discounted evidence of progressively worsening hand tremors based on the report of Dr. Bailey (*Id.* at 18, citing Tr. 468-71); erroneously relied on plaintiff's role as "stay-at-home" father to find plaintiff was not wholly credible (*Id.*, citing Tr. 15); and ignored evidence that plaintiff had difficulty performing some household tasks. (*Id.* at 20, citing Tr. 487, 512, 520).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.,* 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p describes the requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186, at *2 (emphasis added).

Here, the ALJ found plaintiff's testimony was not fully credible. The ALJ's decision sets forth the reasons for her credibility finding and reflects consideration of the required factors for determining plaintiff's credibility, including his allegations of disabling pain. *See* 20 C.F.R.

18

§ 404.1529(c). (Tr. 15). The ALJ considered the inconsistency between plaintiff's allegations concerning the severity of his symptoms and the objective medical evidence; the inconsistency between plaintiff's ability to manage a career in construction/carpentry, which presumably requires considerable use of the hands, and his report that he has suffered hand tremors his entire life; plaintiff's failure to seek treatment for diverticulitis and his testimony that he has not had a flare-up for a year; Dr. Bailey's normal findings on examination of plaintiff's neck and right arm notwithstanding plaintiff's complaints of chronic pain; and plaintiff's ability to care for three young children - a three year old and six year old twins - while his wife is at work, which requires some standing and level of exertion. (Tr. 15). Plaintiff has not shown the ALJ erred by discounting his credibility based on these factors or that the ALJ's credibility finding is not supported by substantial evidence.

Plaintiff argues that the ALJ improperly discounted his testimony as to the severity of his hand tremors based on the report of Dr. Bailey, who described only a "mild bilateral hand tremor" and no difficulty with manipulation. (Tr. 469, 471). Plaintiff argues that the observations of his family physician, Dr. Chandra, are more reliable because whereas Dr. Bailey allegedly focused her examination largely on plaintiff's orthopedic complaints, Dr. Chandra saw plaintiff several times and on occasion saw plaintiff specifically for his tremors. (Doc. 11 at 18, citing Tr. 440-41, 542). Contrary to plaintiff's argument, there is no indication in Dr. Bailey's report that she focused on orthopedic issues. (Tr. 468-75). In addition, Dr. Chandra reported tremors, but his office notes include only plaintiff's subjective reports as to the severity of the tremors. (Tr. 542). Aside from plaintiff's self-reported symptoms, there is nothing in the record to show plaintiff's tremors increased in severity. Thus, the ALJ did not err by discounting plaintiff's credibility on this ground.

Nor did the ALJ err by assuming plaintiff's role as a "stay-at-home" father required some level of exertion and standing and by indicating plaintiff's extreme allegations were inconsistent with an ability to perform the duties demanded by this role.  (Tr. 15).  It is not unreasonable to conclude that an individual with the exertional limitations described by plaintiff would be unable to care for three young children on a sustained daily basis.  In addition, the ALJ did not err by failing to consider plaintiff's complaints as to difficulty performing household tasks, such as lifting a gallon of milk or lifting a young child.  (Doc. 11 at 20, citing Tr. 486, 487, 512).  Plaintiff's complaints in this regard predate his course of physical therapy (Tr. 506-520), and there is no evidence that he experienced neck and right shoulder symptoms that precluded him from performing these activities or imposed any functional limitations after he completed physical therapy.

Accordingly, the Court finds substantial evidence supports the ALJ's credibility finding in this matter.  Plaintiff's third assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED.**

Date: 5/30/2013

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

PHILLIP LAY,
      Plaintiff,

  vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:12-cv-361
Dlott, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

21